**UNITED STATES DISTRICT COURT**
**IN THE EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISON**

| | |
|---|---|
| ENGLEWOOD MARKETING GROUP, INC., a Delaware corporation, | Case No. |
| *Plaintiff*, | |
| v. | Removed From Brown County Circuit Court Case No. 2022CV000088 |
| ONL-RBW LOGISTICS, LLC, a Georgia limited liability company, | |
| *Defendant*. | |

## NOTICE OF REMOVAL TO FEDERAL COURT

Defendant ONL-RBW Logistics, LLC ("Defendant"), and without consenting to personal jurisdiction or waiver of any defenses under Fed. R. Civ. P. 12(b), hereby removes this action from the Brown County Circuit Court, State of Wisconsin, to the United States District Court for the Eastern District of Wisconsin, pursuant to 28 U.S.C. §§ 1332 and 1441. In support, and for purposes of removal only, Defendant states:

### BACKGROUND

1.     On January 20, 2023, Plaintiff Englewood Marketing Group, Inc. ("Plaintiff"), commenced this action against Defendant in the Brown County Circuit Court, State of Wisconsin (the "State Court Action"). The action was assigned case number 2022CV000088.

2.     Under 28 U.S.C. § 1446(a), a complete copy of all process and pleadings served upon Defendant in the State Court Action is attached as **Exhibit 1.**

3.     Under 28 U.S.C. § 1446(c), this Notice of Removal is timely because this Notice is being filed within 30 days of the date upon which Plaintiff's Complaint was received. Plaintiff commenced the State Court Action on January 20, 2023, and Defendant's Georgia counsel executed an Admission of Service on behalf of Defendant on February 1, 2023. This Notice is timely because it is within 30 days of both the commencement of the State Court Lawsuit and Defendant's receipt of Plaintiff's Complaint.

4.     The Brown County Circuit Court is located in the Eastern District of Wisconsin, Green Bay Division. Thus, this Court is the district and division "embracing the place where [the State Court] action is pending." 28 U.S.C. § 1441(a); *see also* 28 U.S.C. § 130.

## Jurisdiction Based on Diversity

5.     This Court has jurisdiction under 28 U.S.C. § 1441(a) because this is a civil action over which this Court has original diversity jurisdiction under 28 U.S.C. § 1332. This case may be removed by the Defendant under 28 U.S.C. § 1441 *et seq.* and § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is an action between citizens of different states, as demonstrated more fully below.

6.     **Plaintiff is a Citizen of Delaware and Wisconsin.**  Plaintiff is a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of Wisconsin. *See* Compl. ¶ 3. A corporation is a citizen of the state or states in which it is incorporated and the state of its principal place of business.

*Wild v. Subscription Plus, Inc.*, 292 F.3d 526, 528 (7th Cir. 2002) (citing 28 U.S.C. § 1332(c)).

Accordingly, Plaintiff was and is a citizen of the States of Delaware and Wisconsin.

7. **Defendant is a Citizen of the States of Georgia, California, Florida, New Jersey, and New York, and the Country of China.** Defendant is a limited liability company organized under the laws of the State of Georgia. The citizenship of a limited liability company is determined by the citizenship of its members. *Wild*, 292 F.3d at 528. The two members of Defendant are: (a) RBW Logistics Savannah, LLC, a Georgia limited liability company ("Member No. 1"), and (b) Trinity Logistics Holdings, LLC, a Delaware limited liability company ("Member No. 2"). The sole member of Member No. 1 is Frank Anderson, a natural person who resides in Georgia. Because natural persons are citizens of the state in which they reside or are domiciled (*Altom Transp., Inc. v. Westchester Fire Ins. Co.*, 823 F.3d 416, 420 (7th Cir. 2016)), Member No. 1 is a citizen of Georgia. The members of Member No. 2 are the following: (a) Haishi International Investments, a corporation under the laws of China, (b) Helen Shi, a resident and citizen of China, (c) Raymond Cheng, a resident of Hong Kong and citizen of China, (d) Bob O'Neill, a New York resident, (e) Bob Agresti, a New Jersey resident, (f) Debbie Sheehy, a New Jersey resident, (g) James O'Neill, a New York resident, (h) Asher Haddad, a Florida resident, (i) Shelly Ganz, a New York resident, (j) Michelle Haddad, a Florida resident, (k) Simon Chan, a New York resident, (l) Robert Lee, a California resident, (m) Robert Wu, a California resident, and (n) Geoff Tice, a New York resident. Accordingly, for diversity of citizenship purposes, Defendant was and is a citizen of the States of Georgia, California, Florida, New Jersey, and New York, and

the country of China. Defendant is not now, and has never been, a citizen of Wisconsin, where the State Court Action was brought, within the meaning of 28 U.S.C. § 1332(c).

8.     Thus, complete diversity jurisdiction exists. Plaintiff is a citizen of Delaware and Wisconsin, and Defendant is a not citizen of either Delaware or Wisconsin.

9.     As to the amount in controversy, under 28 U.S.C. § 1332(a), the amount exceeds the sum or value of $75,000 exclusive of interest, costs, and fees. Plaintiff's Complaint makes it evident that the amount in controversy is greater than $75,000.

10.     The Complaint contains the following allegation:

> [F]our of EMG's customers assessed penalty charges against EMG for these deficiencies against EMG totaling $203,688. RBW's work also resulted in inventory discrepancies of EMG's goods which totaled $22,745.82. Finally, EMG's new services provider performed services to correct RBW's deficient loading, palletization, replacement of pallets and shrink-wrapping of EMG's goods. EMG paid $34,755 for this work. EMG's losses to date resulting from RBW's deficient provision of services exceeds $260,000. Beyond this, after RBW notified EMG that all of EMG's goods had to be out of the warehouse in Savannah by December 30, 2022, RBW invoiced EMG amounts totaling approximately $70,000 for overtime, additional forklifts and dumpsters used to remove EMG's goods from the premises in advance of RBW's deadline. EMG challenges these invoices, but to the extent it is determined to be responsible for these charges driven by RBW's demand that EMG exit the warehouse, these amounts would be additional damages to EMG.

Compl. ¶ 11.

11.     Defendant denies liability related to the allegations in Plaintiff's Complaint. However, for purposes of the amount in controversy, Plaintiff's allegations, if proven, exceed the sum or value of $75,000, exclusive of interest, costs, and fees. Notwithstanding that the jurisdictional requirements have been met, nothing

in this Notice of Removal should be construed as an admission that Plaintiff is entitled to any judgment or relief in its favor or that the Court has personal jurisdiction over Defendant.

## ALL PROCEDURAL REQUIREMENTS FOR DIVERSITY JURISDICTION HAVE BEEN MET

12.     Defendant files this notice of removal within the 30-day time limit allowed under 28 U.S.C. § 1446(b).

13.     Defendant has not previously sought removal of this action.

14.     Defendant is noticing removal of this action.

15.     A Notice of Filing Notice of Removal and a copy of this Notice of Removal will be filed with the Brown County Circuit Court, as required by 28 U.S.C. § 1446(d), and copies of the same have been served upon Plaintiff, as verified by the attached proof of service.

16.     Defendant reserves the right to amend or supplement this Notice of Removal.

17.     Defendant reserves all defenses including, without limitation, those affirmative defenses set forth in Fed. R. Civ. P. 12.

WHEREFORE, Defendant ONL-RBW Logistics, LLC hereby removes the State Court Action from the Brown County Circuit Court, State of Wisconsin, to the United States District Court for the Eastern District of Wisconsin and requests that this Court take jurisdiction of this civil action to the exclusion of any further proceedings in the State Court.

Respectfully submitted,

/s/ *Jason R. Asmus*
Jason R. Asmus, Atty. No. 1096120
TAFT STETTINIUS & HOLLISTER LLP
2200 IDS Center
80 South 8th Street, Suite 2200
Minneapolis, MN 55402
P: 612-977-8400
F: 612-977-8650
jasmus@taftlaw.com

*Attorneys for Defendant ONL-RBW Logistics, LLC*

## CERTIFICATE OF SERVICE

The undersigned states that on February 17, 2023, the Notice of Removal and the

Notice of Filing of Notice of Removal was served by United States mail and email on

counsel for Plaintiff as follows:

Jonathan T. Smies
Godfrey & Kahn, S.C.
200 South Washington Street, Suite 100
Green Bay, WI 54301-4298
jsmies@gklaw.com

*/s/ Jason R. Asmus*

76214745v1

# EXHIBIT 1

**Pleadings in State Court Action**

**FILED**
**01-20-2023**
**Clerk of Circuit Court**
**Brown County, WI**
**2023CV000088**
**Honorable Timothy A**
**Hinkfuss**
**Branch 7**

STATE OF WISCONSIN    :    CIRCUIT COURT    :    BROWN COUNTY

ENGLEWOOD MARKETING GROUP, INC.
1471 Partnership Drive
Green Bay, WI 54304,

              Plaintiff,

    v.

ONL-RBW LOGISTICS, LLC
326 Prep Phillips Drive
Augusta, GA 30901,

              Defendant.

Case No. 23-CV-_____

Code No(s). 30303 (Other Contracts)

---

## SUMMONS

---

THE STATE OF WISCONSIN

To each person named above as a Defendant:

      You are hereby notified that the Plaintiff named above have filed a lawsuit or other legal action against you.  The Complaint, which is attached, states the nature and basis of the legal action.

      Within twenty (20) days of receiving this Summons, you must respond with a written answer, as that term is used in Chapter 802 of the Wisconsin Statutes, to the Complaint. The Court may reject or disregard an answer that does not follow the requirements of the statutes.  The answer must be sent or delivered to the Court, whose address is 100 S. Jefferson Street, Green Bay, Wisconsin, 54301, and to Godfrey & Kahn, S.C., Attention: Jonathan T. Smies, 200 South Washington Street, Suite 100, Green Bay, Wisconsin  54301-4298.

      You may have an attorney help or represent you.

If you do not provide an answer within twenty (20) days, the Court may grant judgment against you for the award of money or other legal action requested in the Complaint, and you may lose your right to object to anything that is or may be incorrect in the Complaint. A judgment may be enforced as provided by law.  A judgment awarding money may become a lien against any real estate you own now or in the future, and may also be enforced by garnishment or seizure of property.

Dated this 20th day of January, 2023.

GODFREY & KAHN, S.C.

By: _Electronically Signed By Jonathan T. Smies_
     Jonathan T. Smies
     State Bar No. 1045422

_Attorneys for Plaintiff Englewood Marketing
Group, Inc._

<u>P.O. ADDRESS</u>:
200 South Washington Street, Suite 100
Green Bay, WI 54301-4298
Phone:  920-432-9300
Fax:  920-436-7988
jsmies@gklaw.com

FILED
01-20-2023
Clerk of Circuit Court
Brown County, WI
2023CV000088
Honorable Timothy A
Hinkfuss
Branch 7

STATE OF WISCONSIN :   CIRCUIT COURT :     BROWN COUNTY

ENGLEWOOD MARKETING GROUP, INC.
1471 Partnership Drive
Green Bay, WI 54304,

Case No. 23-CV-_____

Code No(s). 30303 (Other Contracts)

        Plaintiff,

    v.

ONL-RBW LOGISTICS, LLC
326 Prep Phillips Drive
Augusta, GA 30901,

        Defendant.

## COMPLAINT

Plaintiff Englewood Marketing Group, Inc. ("EMG"), by its attorneys, Godfrey & Kahn, S.C., as and for its Complaint against Defendant ONL-RBW Logistics, LLC ("RBW"), alleges as follows:

### NATURE OF THE LAWSUIT

1.      In 2019, RBW agreed to provide EMG warehouse space near the Port of Savannah, Georgia, to store EMG's consumer merchandise, as well as services EMG required to have those goods shipped to its customers, which are retailers.  Even though RBW agreed it would provide storage and services and give EMG at least six-months' notice before terminating the agreement after the initial term, which ran through December 31, 2022, RBW never provided notice of termination before it ceased providing storage and services to EMG.  By its terms, since neither party provided notice of termination prior to July 1, 2022, the agreement renewed through 2023. In August of 2022 RBW repudiated the agreement when it failed to renew the lease of the premises at which it was providing storage and services to EMG and by telling EMG that it would need to

remove all of its goods from the premises by the end of 2022. In October of 2022, RBW demanded that EMG no longer have its goods shipped to the warehouse at which RBW was providing services and that EMG remove its goods from the premises. RBW ceased providing storage and services to EMG. RBW even demanded, without any basis in the agreement, that EMG pay in advance for its services and threatened significant penalties against EMG and to seize EMG's goods. EMG was also faced with the potential loss of entire lines of its business with its major retail customers given RBW's threats, including that EMG's goods, which EMG had committed to provide to its customers, would no longer be received at the warehouse.

2.      As a result of RBW's repudiation of and failure to perform under the contract, and threats of massive penalties and seizure of its goods, EMG had to find another storage and service provider and suffered damages as a result. EMG has also suffered damages resulting from RBW's deficient and grossly negligent performance before it ceased work.

## PARTIES

3.      EMG is a Delaware corporation with a principal place of business located at 1471 Partnership Drive, Green Bay, Wisconsin 54304. EMG is a national distribution, marketing and logistics solutions provider focused on category-leading kitchen, home, and personal care products. EMG's customers include major retailers of consumer products.

4.      RBW is a Georgia limited liability company with a principal place of business located at 326 Prep Phillips Drive, Augusta, Georgia 30901. The registered agent of RBW is James B. Trotter, with a registered address of 3527 Walton Way Ext., Augusta, Georgia 30909.

## JURISDICTION AND VENUE

5.      The Court has personal jurisdiction over RBW pursuant to Wis. Stat. § 801.05(1)(d) because RBW is engaged in substantial and not isolated activities within this state, and because

RBW has sufficient minimum contacts with Wisconsin and this Court's exercise of personal jurisdiction over RBW comports with fair play and substantial justice. RBW does substantial business in Wisconsin, including having attended meetings on multiple occasions at EMG's offices in Green Bay, Wisconsin and engaging in numerous communications and correspondences with EMG's employees in Wisconsin from 2019 through 2022.

6.     Venue is proper in this Court pursuant to Wis. Stat. § 801.50(2) because the claim arose in this county and because the RBW does substantial business in this county.

## BACKGROUND FACTS

7.     EMG and RBW entered into a written agreement, effective August 1, 2019 (the "Agreement"), pursuant to which RBW would provide "storage space, materials handling facilities, and personnel necessary for the receipt, storage, packaging and delivery" of EMG's goods in Pooler, Georgia. (Agreement at 1.) A true and correct copy of the Agreement is attached as **Exhibit A**.

8.     Under the Agreement, RBW committed to provide the physical facilities necessary to perform certain services. Specifically, RBW agreed to provide up to 60,000 square feet of storage space at a facility located at 300 Morgan Lakes Industrial Boulevard in Pooler, Georgia, or a greater amount of storage space as agreed upon by the parties for the storage and handling of EMG's goods.

9.     The services RBW agreed to provide to EMG included receiving, storing, unpacking, repacking, sorting, inspecting and preparing for shipment the goods EMG deposited at RBW's facility. Specifically, the Agreement required RBW, defined as the "CONTRACTOR" to perform the following services for EMG, defined as the "DEPOSITOR," among others identified in the Agreement:

4. **SERVICES TO BE PERFORMED**. (A) CONTRACTOR shall receive, store, unpack, repack, sort, inspect, and prepare for shipment DEPOSITOR's GOODS at the FACILITIES. The specific services (hereinafter, the "SERVICES") that CONTRACTOR shall provide DEPOSITOR, during the term of the Agreement, shall include but not be limited to the following: (i) receipt and storage of the GOODS at the FACILITIES; and (ii) all aspects of fulfillment of the GOODS ordered by DEPOSITOR's customers ("CUSTOMERS"), including without limitation, order processing, picking, packaging and shipment of orders/GOODS to CUSTOMERS, and processing requests for return merchandise authorizations, where applicable.

(Agreement at 3.)

10.     RBW began storing EMG's goods and performing services under the Agreement

on or about August 1, 2019.

11.     RBW's performance of services for EMG was deficient in various ways. RBW

failed to ship EMG's goods to the standards of EMG's customers on numerous occasions. For

example, EMG's customers complained about the fact that shipments prepared by RBW failed to

have labels placed appropriately, lacked advance shipment notices, and the quantity shipped often

did not match the quantity received by EMG's customers. As a result, four of EMG's customers

assessed penalty charges against EMG for these deficiencies against EMG totaling $203,688.

RBW's work also resulted in inventory discrepancies of EMG's goods which totaled $22,745.82.

Finally, EMG's new services provider performed services to correct RBW's deficient loading,

palletization, replacement of pallets and shrink-wrapping of EMG's goods. EMG paid $34,755

for this work. EMG's losses to date resulting from RBW's deficient provision of services exceeds

$260,000. Beyond this, after RBW notified EMG that all of EMG's goods had to be out of the

warehouse in Savannah by December 30, 2022, RBW invoiced EMG amounts totaling

approximately $70,000 for overtime, additional forklifts and dumpsters used to remove EMG's

goods from the premises in advance of RBW's deadline. EMG challenges these invoices, but to

the extent it is determined to be responsible for these charges driven by RBW's demand that EMG

exit the warehouse, these amounts would be additional damages to EMG.

12.     The initial term of the Agreement was for thirty-six (36) months, beginning on August 1, 2019.  The Agreement provided that after this initial term the Agreement would automatically renew on a year-to-year basis. The parties to the Agreement had the right to terminate the agreement after the initial term with six-months' notice by serving a written notice of termination on the other party.

13.     On August 4, 2021, EMG and RBW executed a First Amendment to Agreement (the "Amendment").  A true and correct copy of the Amendment is attached as **Exhibit B**.  The Amendment provided that, effective August 1, 2021, RBW would begin storing EMG's goods and providing services at a new location, 239 Jimmy Deloach Parkway, Savannah, Georgia 31408, as well as the original facility located in Pooler, Georgia.  The Amendment further provided that the initial term of the Agreement was extended until December 31, 2022 with respect to the new facility located in Savannah, but terminated upon the date of the removal of EMG's remaining goods at the facility in Pooler.

14.     On August 2, 2022, EMG learned through a third party that RBW did not own the Savannah facility at which it had been providing storage and services for EMG, and that RBW had to surrender the facility back to its landlord at the end of 2022. Prior to EMG learning this, RBW never disclosed to EMG that it was not the owner of the warehouse.  EMG learned that RBW's lease for the space would be ending on December 31, 2022 and its landlord would be leasing the space to a third party beginning on January 1, 2023.

15.     The relationship between the parties further soured in October of 2022.  On October 18, 2022, Frank Anderson of RBW wrote the following to RBW's VP of Operations and two EMG employees and directed that EMG could no longer have its goods shipped to the warehouse:

5

**From:** Frank Anderson <frank@rbwlogistics.com>
**Sent:** Tuesday, October 18, 2022 2:52 PM
**To:** RBW Karen White <Karen@onl-rbwlogistics.com>; Denise L. Lawniczak <DLawniczak@emg-usa.com>
**Cc:** Kevin Oak <KOak@emg-usa.com>; Tony Calabrase <tony@rbwlogistics.com>
**Subject:** RE: Exit

Thanks Karen.  To further clarify a few points:

1. Receipts need to be cut off now and diverted elsewhere.  We cannot extend further.
2. If there is product still in the facility at the end of the year EMG will need to provide staff and equipment to get it out.  There will be holdover penalties that the landlord will impose and must be paid by EMG.
3. Payment for all services will be expected in advance before all material can be released.  Notice to this effect will be provided by legal to EMG shortly.
4. A reasonable exit strategy must be agreed to by both parties as quickly as possible.  Working our teams after hours and on weekends for extended periods of time is not a reasonable expectation.

Kevin – I've asked Karen to work closely with your team to implement an effective exit strategy asap.  Wishing you all the best in your new endeavors.

Kindest regards,

Frank A

16.     By December 31, 2022, RBW no longer stored EMG's goods and ceased performing any services for EMG under the Agreement.

17.     Despite its breach of the Agreement, RBW has demanded payment from EMG on certain invoices it claimed to be due.  By letter dated December 20, 2022 from James B. Trotter, RBW's registered agent and counsel, RBW threatened that if certain invoices were not paid within three days RBW would "exercise its right to hold back 10 loads of EMG's inventory and transfer them to another secure facility until such time as RBW is paid in full."  Nothing in the Agreement authorized RBW to hold EMG's property hostage as leverage in a dispute concerning invoiced charges.

18.     RBW has failed to comply with its obligations under the Agreement by failing to provide the contractually required six-months' written notice prior of termination before ceasing its performance of the Agreement.  By its terms, since neither party provided notice of termination prior to July 1, 2022, the agreement renewed through 2023.  By its unequivocal statements and

conduct, RBW repudiated the Agreement.  This amounts to a material breach of the terms of the Agreement, entitling EMG to have and recover from RBW damages as set forth herein.

19.    Without being afforded the contractually-required notice of termination, EMG was required to find other storage and service providers in order to fulfill its contractual obligations to third-party retailers.

20.    EMG was able to contract with another storage and service provider after RBW's failure to provide the storage and services it committed to provide in the Agreement.  EMG has incurred damages in the form of the higher rates it has paid, and will continue to pay, for storage and services since RBW ceased performance, as well as damages for RBW's negligent performance and willful misconduct.

<u>**CLAIM FOR BREACH OF CONTRACT**</u>

21.    EMG realleges and incorporates by references the allegations contained in paragraphs 1 through 20 as if fully set forth herein.

22.    EMG entered into a valid and enforceable Agreement with RBW for storage and services relating to EMG's goods.

23.    RBW breached the Agreement by ceasing to provide storage and services to EMG and unequivocally stating that it would not continue to provide such services.

24.    RBW's failure to perform its obligations pursuant to the Agreement caused EMG to incur additional costs, expenses, and damages.

25.    RBW also failed to adequately perform certain services related to the storage, handling and shipment of EMG's goods; namely, RBW failed to: (1) use reasonable care in the stacking and handling of the goods thereby causing damage thereto; (2) place labels in the

appropriate places on the goods; (3) send advance shipment notices; and (4) send the proper number of goods called for in certain orders.

26.      Because of the many breaches of contract by RBW, EMG did not receive the benefit of what it bargained for and is entitled to damages to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Englewood Marketing Group, Inc. respectfully requests the following relief:

A.      Entry of judgment in its favor against ONL-RBW Logistics, LLC;

B.      An award of damages for all amounts owed under its claim for breach of contract;

C.      An award of costs, disbursements, and attorneys' fees as allowed by law or contract; and

D.      Such other and further relief the Courts deems appropriate and just.

Dated this 20th day of January, 2023.

GODFREY & KAHN, S.C.

By: *Electronically Signed By Jonathan T. Smies*
    Jonathan T. Smies
    State Bar No. 1045422

*Attorneys for Plaintiff Englewood Marketing Group, Inc.*

P.O. ADDRESS:
200 South Washington Street, Suite 100
Green Bay, WI 54301-4298
Phone:  920-432-9300
Fax:  920-436-7988
jsmies@gklaw.com
28665990.4

# Agreement

**THIS AGREEMENT**, made and entered into as of this 1st day of August, 2019, by and

between **ENGLEWOOD MARKETING GROUP, INC.,** a Delaware corporation (hereinafter termed DEPOSITOR) with principal offices located at 1471 Partnership Drive, Green Bay WI 54304, and **ONL-RBW LOGISTICS, LLC.,** a Georgia limited liability corporation (hereinafter termed CONTRACTOR) with principal offices located at 326 Prep Phillips Dr, Augusta, GA 30903 (each a "Party" and collectively, the "Parties").

# Witnesseth:

**WHEREAS**, DEPOSITOR desires to engage CONTRACTOR to provide the storage space, materials handling facilities, and personnel necessary for the receipt, storage, packaging and delivery of its goods (hereinafter, the "GOODS"); and

**WHEREAS**, CONTRACTOR has such space available and the facilities, equipment and personnel to provide the service required;

**NOW, THEREFORE** in consideration of the mutual covenants and conditions contained herein the Parties agree as follows:

1. **TERM**. Unless sooner terminated as provided in this Agreement, the term of this Agreement shall commence on **August 1, 2019** (the "Commencement Date"), and shall continue thereafter in full force and effect for a period of thirty-six (36) months (the Initial Term) and shall thereafter automatically renew on a year-to-year basis. Either Party has the right to terminate this Agreement at any time by serving not less than six (6) months prior written notice to that effect upon the other Party with an effective date no earlier than the expiration of the Initial Term.

2. **FACILITIES**. (A) CONTRACTOR will provide the physical facilities necessary to perform the SERVICES (as defined in Section 4 below) hereunder from time to time including, without limitation, up to 60,000 square feet of storage space in the facility located at 300 Morgan Lakes Industrial Blvd, Pooler, GA 31322, or such greater amount of storage space as may be required to meet DEPOSITOR's needs hereunder subject to a mutually agreed upon timeline and rates for the addition of such greater space (hereinafter, the "FACILITIES"). These FACILITIES shall be used exclusively for the storing and handling of the GOODS.

(B) CONTRACTOR will provide, at its cost, janitorial and cleaning services, trash collection, sewer, water, gas, electricity, real property taxes, maintenance, and all other expenses associated with the use of the FACILITIES.

(C) If the Facilities or any portion thereof shall be damaged or destroyed by fire or other casualty (hereinafter an "OCCURRENCE") so as to materially interfere with the SERVICES to be provided under this Agreement, the following provisions shall apply:

    (i) CONTRACTOR shall promptly give notice to DEPOSITOR of the OCCURRENCE.

    (ii) If less than 50% of the FACILITIES are damaged but the FACILITIES are still operational and CONTRACTOR is capable of substantially performing the SERVICES hereunder, CONTRACTOR shall promptly begin to and diligently repair the FACILITIES. Notwithstanding the foregoing, if such repairs



EXHIBIT

A

shall require, or be estimated to require, longer than six (6) months to complete, or if more than 25% of the FACILITIES are damaged and DEPOSITOR reasonably believes the SERVICES hereunder shall be materially affected, DEPOSITOR shall have the right to terminate the Agreement on not less than thirty (30) days' notice. If a greater percentage than 50% of the FACILITIES is damaged, this Agreement shall forthwith terminate.

(iii) If this Agreement has not been terminated pursuant to the foregoing, the Parties agree to negotiate in good faith to obtain interim space to continue operations and the SERVICES hereunder if and to the extent deemed necessary or desirable by the Parties.

(iv) During the period of repair the obligations of the parties shall be reduced on a pro rata basis reflecting the usable space remaining in the FACILITIES during the period of repair, and giving effect to the interim space being used to achieve the mutual objectives of this Agreement.

(D) CONTRACTOR will provide all required equipment customary to warehousing and fulfillment services and as necessary to perform the SERVICES hereunder, including without limitation, fork trucks, hand trucks, racking, material handling equipment, workstations, printers, and scanners. Any specialized data processing hardware and software required by DEPOSITOR shall be provided and maintained at DEPOSITOR's sole cost.

3. **RATES AND CHARGES**. (A) Appendix A contains the schedule of rates and charges that will apply during the Initial Term of this Agreement and any renewal term unless otherwise modified by the Parties pursuant hereto.

(B) All storage charges are per pallet, carton or other unit per month specified in Appendix A. All storage related charges begin on the date that CONTRACTOR accepts care, custody, and control of the GOODS at the FACILITIES, by warehouse receipt or signature. A full month's storage charge will apply on all GOODS so received and accepted by CONTRACTOR between the first and the 15th, inclusive, of a calendar month; one-half month's storage charge will apply on all GOODS so received and accepted by CONTRACTOR between the 16th and the last day, inclusive, of a calendar month, and a full month's storage charge will apply to all GOODS in storage on the first day of the next and succeeding calendar months.

(C) The attached Appendix B sets forth the DEPOSITOR's specifications for the SERVICES to be provided, including the volume of GOODS to be handled, the frequency of turns, and certain other operational information upon which the rates and charges are based and assessed. DEPOSITOR and CONTRACTOR shall review Appendices A and B at the end of each calendar quarter during the term hereof commencing January 1, 2020 and may mutually agree to appropriate adjustments to the schedule of rates to reflect the actual service being provided or to conform the service requirements to those specified on Appendix B.

(D) Any material changes required by DEPOSITOR in the SERVICES provided by CONTRACTOR or in the type of GOODS to be handled by CONTRACTOR may incur new or adjusted rates as mutually agreed upon between the Parties. CONTRACTOR shall be entitled to handling rate adjustments to offset any changes to federal or state labor laws on employment taxes, health care, and minimum wage requirements which are not otherwise offset by the cost of living adjustment in Subparagraph (E) below ("GOVERNMENT MANDATES").

(E) The Parties acknowledge and agree that commencing on August 1, 2020 and each anniversary thereafter, CONTRACTOR shall be entitled to an increase on all handling and labor related charges equal to that of the Consumer Price Index (CPI) or 2.5%, whichever is greater. The intent of the annual cost adjustment is to cover the annual increases in labor costs. The CPI increase will be calculated from the effective date through the latest date for which a current index is available prior to the scheduled increase. "CPI" shall mean the Consumer Price Index for All South Urban Consumers, All Items (Base year 1982-1984 = 100) not seasonally adjusted, published by the United States Department of Labor Bureau of Labor Statistics. If the CPI is substantially revised or becomes unavailable to the public because publication is discontinued, the Parties agree to substitute a comparable index based upon changes in the cost of living or purchasing power of the consumer dollar published by a governmental agency, major bank, other financial institution, university, or recognized financial publisher. The Parties acknowledge and agree that they shall review the charges and scope of services on Appendix A and Appendix B at the end of each annual anniversary period of this Agreement, and adjust charges

2

based on the Consumer Price Index and GOVERNMENT MANDATES that may result in increases to the CONTRACTOR's labor costs.

(F) CONTRACTOR shall not be liable to DEPOSITOR or any third party for any demurrage or detention, any delays in unloading trailers or other containers, or any delays in obtaining and loading trailers or other containers for outbound shipment unless CONTRACTOR has (i) failed to meet or comply with the service levels or procedures set forth in the KPI's or applicable CUSTOMER OPERATING PROCEDURES (as such terms are defined in Section 4 below) or (ii) failed to exercise reasonable care under the circumstances as determined by industry practice.

(G) CONTRACTOR labor required for services other than those specified and contemplated herein will be charged to the DEPOSITOR at equivalent rates. Special services requested by DEPOSITOR for which a service rate is not specified in Appendix A, including but not limited to compiling of special stock statements, reporting marked weights, serial numbers or other data from packages, conducting physical inventory of GOODS, and handling transit billing will be subject to a charge as may be mutually agreed upon in advance in writing by the Parties.

(H) Dunnage, bracing, or other special packaging materials or supplies, may be provided for the DEPOSITOR upon DEPOSITOR's request at a reasonable agreed upon charge in addition to the CONTRACTOR's cost, or DEPOSITOR may elect in the alternative to supply same to CONTRACTOR at DEPOSITOR's cost and expense.

(I) By prior arrangement, GOODS may be received or delivered during other than usual business hours, subject to a charge.

4. **SERVICES TO BE PERFORMED**. (A) CONTRACTOR shall receive, store, unpack, repack, sort, inspect, and prepare for shipment DEPOSITOR's GOODS at the FACILITIES. The specific services (hereinafter, the "SERVICES") that CONTRACTOR shall provide DEPOSITOR, during the term of the Agreement, shall include but not be limited to the following: (i) receipt and storage of the GOODS at the FACILITIES; and (ii) all aspects of fulfillment of the GOODS ordered by DEPOSITOR's customers ("CUSTOMERS"), including without limitation, order processing, picking, packaging and shipment of orders/GOODS to CUSTOMERS, and processing requests for return merchandise authorizations, where applicable.

(B) CONTRACTOR shall be responsible for selecting the area within the FACILITIES for storing the GOODS and may, without notice, move the GOODS within the FACILITIES, but shall not, without DEPOSITOR's prior written consent move GOODS to another location.

(C) CONTRACTOR shall comply with (i) the applicable operating procedures set forth in any vendor operating, compliance, or partnership manual prepared by a CUSTOMER (the "CUSTOMER OPERATING PROCEDURES"), provided that DEPOSITOR shall furnish a copy to CONTRACTOR in advance and CONTRACTOR has not reasonably objected to same (or to any modification thereto) within ten (10) days after receipt; and (ii) all applicable laws, rules and regulations relating to the performance of such SERVICES. CONTRACTOR shall not be liable for loss or damage to the GOODS resulting from complying with the applicable CUSTOMER OPERATING PROCEDURES.

(D) CONTRACTOR agrees to maintain service levels in accordance with Key Performance Indicators ("KPIs") as defined in Appendix (D). If service levels fall below the established KPIs, upon written notice to CONTRACTOR by DEPOSITOR, a 30-day cure period will be established for the KPI which is out of standard. If CONTRACTOR has not cured the service failure KPI within the (30) day period, a second written notice of failure may be issued to CONTRACTOR by DEPOSITOR. If CONTRACTOR cannot cure the out of standard KPI by the end of the second cure period or within (90) days of the start of the initial cure period, whichever is less, DEPOSITOR shall have the right to terminate this Agreement upon 30 days written notice to CONTRACTOR.

(E) Upon CONTRACTOR's receipt of DEPOSITOR's written instructions sent by an authorized representative of DEPOSITOR, including instructions regarding the priority or urgency to be applied to any specific product and any and all specific compliance instructions required by a CUSTOMER, CONTRACTOR will use commercially

3

reasonable efforts to comply with such instructions. In connection with the performance of SERVICES, CONTRACTOR will comply with all commercially reasonable policies of DEPOSITOR and its CUSTOMERS (in accordance with Section 4(C) hereof).

(F) All instructions (including overtime authorizations) shall be written. Email format is acceptable, provided such communication is from an authorized representative of DEPOSITOR.

(G) DEPOSITOR shall provide CONTRACTOR with a list of representatives who are authorized to add or delete SERVICES, give instructions pursuant to this Agreement, and bind DEPOSITOR pursuant to this Agreement. From time to time, as additional SERVICES are agreed to by the Parties, or any SERVICES are deleted as agreed to by the Parties, the attached Appendices (A,B,C,& D) shall be revised to reflect the applicable SERVICES, procedures, and pricing structures.

5. **GOODS.** (A) DEPOSITOR represents and warrants that DEPOSITOR is lawfully possessed of the GOODS and has the right to and authority to store them with CONTRACTOR. DEPOSITOR agrees to indemnify, defend and hold harmless the CONTRACTOR from all loss, cost, and expense (including reasonable attorneys' fees) that CONTRACTOR pays or incurs as a result of any dispute or litigation, instituted by a third party, respecting DEPOSITOR's right, title, or interest in the GOODS.

(B) DEPOSITOR represents and warrants to CONTRACTOR that there are no known potential health, safety and/or environmental hazards associated with the storage and handling of such GOODS. DEPOSITOR will provide CONTRACTOR with information concerning the GOODS that is accurate, complete, and sufficient to allow CONTRACTOR to comply with all applicable laws and regulations concerning the storage, handling, and transporting of the GOODS. DEPOSITOR will indemnify and hold CONTRACTOR harmless from all loss, cost, penalty and expense (including reasonable attorneys' fees) that CONTRACTOR pays or incurs as a result of DEPOSITOR failing to fully discharge this obligation.

(C) If, as a result of a quality or condition of the GOODS of which CONTRACTOR had no notice at the time of deposit, the GOODS are a hazard to other property or to the warehouse or to persons, CONTRACTOR shall immediately notify DEPOSITOR and DEPOSITOR shall promptly remove the GOODS from the FACILITIES. If DEPOSITOR fails to remove such GOODS in a timely manner, the CONTRACTOR may, upon reasonable notice to DEPOSITOR specifying the intended date of removal and destination of such GOODS, remove the GOODS from the FACILITIES and shall incur no liability by reason of such removal.

6. **DELIVERY AND RELEASE OF GOODS**. (A) All GOODS shall be delivered at the FACILITIES in a segregated manner, properly marked and packaged for storage and handling. The DEPOSITOR shall furnish at or prior to such delivery, a manifest showing marks, brands, or sizes to be kept and accounted for separately, and the class of storage and other services desired. Except as otherwise provided in Section 7 below, (i) CONTRACTOR is not a guarantor of the condition of such GOODS under any circumstances, including, but not limited to hidden, concealed, or latent defects in the GOODS, and (ii) any such concealed shortages, damage or tampering will not be the responsibility of CONTRACTOR.

(B) DEPOSITOR agrees that all GOODS shipped to CONTRACTOR shall identify DEPOSITOR on the bill of lading or other contract of carriage as the named consignee, in care of CONTRACTOR, and shall not identify CONTRACTOR as the consignee. The parties agree that, regardless of whether CONTRACTOR is incorrectly identified as named consignee, or DEPOSITOR fails to notify carrier of the incorrect identification on the bill of lading or other contract of carriage, under no circumstances shall CONTRACTOR be considered the consignee for purposes of identifying the "importer" under the Food Safety Modernization Act ("FSMA") or any foreign supplier verification program ("FSVP"), at 21 U.S.C. § 384a. CONTRACTOR shall not be responsible for complying with or performing the duties required of an "importer" under 21 U.S.C. § 384a. Notwithstanding anything in this Agreement to the contrary, in the event CONTRACTOR is determined to be an "importer" as a result of DEPOSITOR's failure to comply with this Section 6 or otherwise, DEPOSITOR agrees to indemnify, defend and hold CONTRACTOR harmless from all liabilities, claims, cost and expenses (including attorney's fees), fines, and penalties resulting there from.

(C) If, in violation of this Agreement, GOODS are shipped to CONTRACTOR as named consignee or shipped from the CONTRACTOR as named shipper or consignor on the bill of lading or other contract of carriage, DEPOSITOR agrees to immediately notify carrier in writing, with copy of such notice to CONTRACTOR, that

4

CONTRACTOR named as consignee is the "in care of party" only and has no beneficial title or interest in the GOODS. Furthermore, CONTRACTOR shall have the right to refuse such GOODS and shall not be liable for any loss, misconsignment, or damage of any nature to, or related to, such GOODS. Whether CONTRACTOR accepts or refuses GOODS shipped in violation of Section 6 (B), DEPOSITOR agrees to indemnify, defend and hold CONTRACTOR harmless from all claims for transportation, storage, handling, and other charges relating to such GOODS, including undercharges, rail demurrage, truck/intermodal detention, and other charges of any nature whatsoever asserted by any third party as a result of such violation.

(D) No GOODS shall be processed for shipment or transferred except on receipt by the CONTRACTOR of DEPOSITOR's complete written instructions. Written instructions shall include, but are not limited to, FAX, EDI, email or similar communication, provided CONTRACTOR has no liability when relying on the information contained in the communication as received. GOODS may be delivered upon instruction by telephone in accordance with DEPOSITOR's prior written authorization, but the CONTRACTOR shall not be responsible for loss or error occasioned thereby.

(E) When GOODS are ordered out, CONTRACTOR shall carry out such instructions within the time specified in the applicable KPI's and Customer Operating Procedures, or if no such time is specified therein, within the reasonable time specified by DEPOSITOR, and if it is unable because of Force Majeure events set forth in Section 12 hereof, or because of loss of or damage to GOODS for which CONTRACTOR is not liable under Section 7 hereof, or because of any other excuse provided by law, the CONTRACTOR shall not be liable for failure to carry out such instructions and GOODS remaining in storage will continue to be subject to regular storage charges.

7. **LIABILITY AND LIMITATION OF DAMAGES** (A) CONTRACTOR shall not be liable for any loss or damage to GOODS tendered, stored, or handled however caused unless such loss or damage resulted from the failure by CONTRACTOR to exercise such care in regard to such GOODS as a reasonably careful person would exercise under like circumstances and CONTRACTOR is not liable for damages that could not have been avoided by the exercise of such care.

(B) Except as provided herein, GOODS are not insured by CONTRACTOR against loss or damage however caused.

(C) CONTRACTOR shall be liable to DEPOSITOR for any loss or damage to the GOODS caused by or resulting from CONTRACTOR's failure to exercise the care required in Section 7 (A). CONTRACTOR shall promptly notify DEPOSITOR of any loss or damage, however caused, to any of the GOODS stored or handled at the FACILITIES. In the event of loss or damage to the GOODS for which CONTRACTOR is legally or contractually liable, DEPOSITOR declares that CONTRACTOR's liability for damages are limited to DEPOSITOR'S landed costs of the GOODS, plus the Service charges hereunder in respect of such GOODS. In no event shall CONTRACTOR's liability exceed the required limits of liability insurance set forth in Section 8 below. However, such liability limit may at the time of acceptance of any GOODS be increased upon DEPOSITOR's written request on part or all of such GOODS hereunder in which event an agreed upon additional monthly charge will be made based on such increased valuation.

(D) Where loss or damage occurs to tendered, stored, or handled goods, for which the CONTRACTOR is not liable hereunder, the DEPOSITOR shall be responsible for the cost of removing and disposing of such GOODS and the cost of any environmental cleanup and site remediation resulting from the loss or damage to the GOODS.

(E) Neither Party shall be liable to the other under this Agreement for any loss of profit or special, indirect, or consequential damages of any kind.

(F) CONTRACTOR shall not be liable for loss of GOODS due to inventory shortage or unexplained or mysterious disappearance of GOODS unless DEPOSITOR establishes such loss occurred because of CONTRACTOR's failure to exercise the care required of CONTRACTOR under Paragraph 7 (A) above. Any presumption of conversion imposed by law shall not apply to such loss and a claim by DEPOSITOR of conversion must be established by affirmative evidence that the CONTRACTOR converted the GOODS to the CONTRACTOR's own use.

5

(G) If CONTRACTOR negligently misships GOODS, CONTRACTOR shall pay the reasonable transportation charges incurred to return the misshipped GOODS to the FACILITIES in addition to refunding any outbound handling Service charges billed hereunder relative to the act of misshipping the GOODS at issue. If the consignee fails to return the GOODS, CONTRACTOR's maximum liability shall be for the lost or damaged GOODS plus the relevant Service charges as specified in Paragraph 7(C) above, and CONTRACTOR shall have no liability for damages due to the consignee's acceptance or use of the GOODS.

(H) In no event shall CONTRACTOR be liable or responsible for invoicing or collections in connection with sale of DEPOSITOR's GOODS.

(I) Notwithstanding anything contained herein to the contrary, CONTRACTOR shall be responsible for chargebacks imposed on DEPOSITOR by its CUSTOMERS as a result of CONTRACTOR's failure to meet the applicable KPIs, provided, however, that in order to properly control and review such chargebacks, the parties agree to the following procedures and conditions with respect to chargebacks:

(i) DEPOSITOR shall submit a written copy of the alleged infraction/chargeback to CONTRACTOR for investigation within seven (7) calendar days from receipt of the infraction/chargeback by DEPOSITOR.

(ii) Where the chargeback is due to an alleged violation by CONTRACTOR of the CUSTOMER OPERATING PROCEDURES of such Customer, DEPOSITOR will provide CONTRACTOR with copies of the chargeback together with any documents or correspondence in its possession that may be of value to CONTRACTOR in its investigation of the violation and its attempts to have the charges mitigated or cancelled by the CUSTOMER.

(iii) In the event it is determined that CONTRACTOR is at fault, and after all remittance options and requests for relief have been exhausted, CONTRACTOR will provide DEPOSITOR within seven (7) days with a credit for, and CONTRACTOR's liability in respect of such chargebacks shall be limited to, the Service charges billed hereunder with respect to the specific GOODS and KPI in question that resulted in the chargeback. For the avoidance of doubt, in no instance will CONTRACTOR be responsible to pay any CUSTOMER or third-party for chargebacks.

(K) Any and all claims made pursuant to this Section must be in compliance with the requirements set forth in Section 18.

(L) In the event a recall, field alert, product withdrawal or field correction (together, "Recall") may be necessary with respect to any GOODS provided under this AGREEMENT, DEPOSITOR shall immediately notify CONTRACTOR in writing. CONTRACTOR will not act to initiate a Recall without the express prior written approval of DEPOSITOR unless otherwise required by applicable laws. The cost of any Recall shall be borne by DEPOSITOR. DEPOSITOR shall indemnify and hold harmless the CONTRACTOR from all loss, cost, penalty, and expense (including reasonable attorneys' fees) which CONTRACTOR pays or incurs as a result of a Recall.

(M) Notwithstanding anything contained herein to the contrary, the limitations of liability set forth herein shall not be applicable to the gross negligence or willful misconduct of CONTRACTOR, including without limitation, any conversion of the GOODS by CONTRACTOR to its own use.

8. **INSURANCE**. CONTRACTOR shall provide the following policies and limits of insurance:

|  | **Coverage** | **Limits** |
|---|---|---|
| **Workers' Compensation** |  | Statutory |
| Comprehensive General Liability with Contractual coverage |  |  |
|  | Bodily Injury Property Damage | $ 2,000,000 combined single limit |

6

Warehousemen's Legal Liability                    Depositor's landed cost up to a maximum
                                                  of $ 10,000,000

Insurance covering loss or damage to DEPOSITOR's GOODS (a) where CONTRACTOR is not liable, or (b) which exceeds the limitation of damages if CONTRACTOR is liable, shall be the responsibility of DEPOSITOR.

**9. BILLING AND PAYMENT.** (A) CONTRACTOR shall bill DEPOSITOR at the end of each month for all charges due and owing under this Agreement for such month. DEPOSITOR agrees to pay the invoices as submitted, without deduction or hold back, within thirty (30) days after receipt, except for such amounts disputed in good faith by DEPOSITOR.  Any dispute as to the amount of the invoice shall be promptly resolved by the Parties.  Claims for loss or damage to GOODS shall not be deducted from invoices, but shall be handled separately as set forth in Section 18.  CONTRACTOR shall apply payment to the amount due for the specified invoice, regardless whether there are earlier unpaid invoices.

(B) In the event any undisputed amount under an invoice remains unpaid for ten (10) days after written notice by CONTRACTOR ("Late Payment"), interest shall be charged on the balance owed in the amount of 1.0% monthly. Until such Late Payment is cured.  The assessment of such charge shall not be deemed a waiver of any other remedy CONTRACTOR may have hereunder, or at law.

(C) All Late Payments referred for collection shall be subject to collection costs and/or attorney fees. Any invoice under dispute shall be sent via email with all pertinent details to (ar@onl-rbwlogistics.com) within 21 days of receipt of the invoice and CONTRACTOR shall promptly respond to same within 7 days.

(D) Upon termination or expiration of this Agreement, for any reason, CONTRACTOR reserves the right to require payment of all charges due and owing as of such termination or expiration date prior to the removal of the GOODS from the FACILITIES.

10. **INDEPENDENT CONTRACTOR**. (A) CONTRACTOR shall act as an independent contractor under this Agreement. It shall perform its obligations under this Agreement using its own employees or agents. It shall decide on the manner and means of accomplishing those obligations and shall direct, control and supervise its employees.

(B) CONTRACTOR shall not hold itself out as an agent of or joint venturer with DEPOSITOR, and CONTRACTOR shall have no authority to act on behalf of DEPOSITOR except to the extent necessary to accomplish its obligations under this Agreement.

11. **TITLE**. CONTRACTOR shall not permit any lien or other encumbrance to be placed against the GOODS while they are in CONTRACTOR's possession. Title to the GOODS shall remain in DEPOSITOR.  On GOODS deposited with CONTRACTOR and in CONTRACTOR's possession hereunder, CONTRACTOR shall have a general warehouse lien for all lawful charges due from DEPOSITOR pursuant to this Agreement, including all expenses incurred by CONTRACTOR for collecting and enforcing this lien, provided, however, that CONTRACTOR shall promptly execute all reasonable and customary documentation for the benefit of DEPOSITOR's lenders confirming the subordination of such liens and permitting such lenders access to the GOODS and the right to remove same.  In the event CONTRACTOR shall fail to promptly execute and deliver such documentation in favor of DEPOSITOR's lender, DEPOSITOR's sole remedy hereunder shall be to terminate this Agreement upon fifteen (15) days' written notice.

12. **FORCE MAJEURE**. Neither party shall be liable to the other for failure to perform its obligations under this Agreement if prevented from doing so because of an act of God, strikes, fire, flood, war, civil disturbance, interference by civil or military authority or similar causes beyond the reasonable control of the party. Upon the occurrence of such an event the party seeking to rely on this provision shall promptly give written notice to the other party of the nature and consequences of the cause. If the cause is one which nevertheless requires CONTRACTOR to, or does not otherwise affect CONTRACTOR's ability to, continue to protect the GOODS the DEPOSITOR agrees to pay the storage or similar charges associated with the CONTRACTOR's obligation during the continuance of the force majeure.

7

13. **INDEMNIFICATION**. Each Party (the "Indemnitor") shall indemnify, defend and hold the other Party (the "Indemnitee") harmless from and against all liabilities, claims, suits, actions, fines, damages, losses, costs, and expenses (including reasonable attorney's fees), including claims arising out of injury to or death of any person or damage to or loss or destruction of any property (except for the GOODS where liability is covered in Section 7 above) caused by or resulting from (i) the Indemnitor and/or its employees or agents' negligent acts or omissions, or failure to perform its obligations hereunder; or (ii) such other matter, cause or thing for which indemnification by Indemnitor is expressly provided under any other Section of this Agreement.

The Indemnitee shall provide prompt notice of any claim or liability to Indemnitor; and with respect to any third party claim for which indemnity is sought hereunder, Indemnitee shall tender defense or settlement to the Indemnitor, and shall fully cooperate in defense of the claim. Should the Indemnitor fail to honor a timely request for indemnification or defense, then the Indemnitee shall have the right to defend same at Indemnitor's cost and expense and/or shall be entitled to all costs (including reasonable attorney's fees) incurred in the enforcement of the right of indemnification hereunder, which enforcement results in a legal judgment in its favor or an acknowledgment by the Indemnitor that the claimed indemnification is valid in a settlement of such claim.

14. **INVENTORIES**. A mutually agreed upon system of inventory verification of all GOODS shall be conducted by CONTRACTOR at intervals as agreed upon by the parties. CONTRACTOR will take physical inventories as requested by DEPOSITOR, at DEPOSITOR's expense. Representatives of DEPOSITOR may be present during any inventory.

15. **INSPECTIONS AND AUDIT OF RECORDS**. DEPOSITOR has the right during normal business hours and upon reasonable notice (i.e. not less than 24 hours' notice), to (i) inspect the GOODS and the operation of the SERVICES at the FACILITIES and (ii) during the term of this Agreement and for a period of two (2) years thereafter, examine the CONTRACTOR's books, records and accounts pertaining to operations under this Agreement. Normal business hours for the FACILITIES shall be 8am-5pm (EST) Monday-Friday, except for nationally recognized holidays.

16. **ASSIGNMENT**. Neither party shall assign or transfer this Agreement or any of its rights or obligations hereunder without the prior written consent of the other party.

17. **TERMINATION**. Either Party may terminate this Agreement (i) immediately upon the insolvency or bankruptcy of the other party, (ii) for a material, non-monetary breach that is not cured within thirty (30) days after written notice of that breach, or if such breach is not capable of being cured within such thirty (30) day period, the defaulting party has not commenced to diligently remedy such breach within said 30 day period and fails to cure same within ninety (90) days of the initial notice, (iii) for a material, monetary breach that is not cured within ten (10) days after written notice of that breach, or (iv) in accordance with any other termination right expressly provided in this Agreement. Termination of this Agreement will not relieve any party of any amounts owed or owing under this Agreement as of the date of termination.

Except as otherwise expressly stated in this Agreement, no termination shall affect any of the non-breaching party's other rights or rights and remedies available under this Agreement, at law or in equity, nor be treated as an election of remedies by the on-breaching party.

Upon termination of this Agreement, both parties shall cooperate fully in the orderly transition of the SERVICES to another warehouseman, and in connection therewith CONTRACTOR shall deliver to DEPOSITOR or its designee all Vendor Data (as hereinafter defined) and return at the instruction and expense of DEPOSITOR any and all merchandise in its possession that is the property of DEPOSITOR, including any remaining GOODS,

18. **NOTICE OF CLAIM FOR LOSS OR DAMAGE**. (A) DEPOSITOR shall give CONTRACTOR written notice of a claim for loss or damage to GOODS of which it becomes aware. Such claim shall be made no later than ninety (90) days after DEPOSITOR is given written notice by CONTRACTOR or any CUSTOMER that loss or damage to the GOODS has occurred, or no later than ninety (90) days after the GOODS have been shipped from the FACILITIES, whichever time is shorter. Such notice shall contain such information, to the extent known and available to DEPOSITOR at the time, as may be reasonably necessary to identify the GOODS affected, the basis for liability and the amount of the alleged loss or damage, as well as all appropriate supporting documentation.

8

(B) No lawsuit or other action may be maintained by the DEPOSITOR against the CONTRACTOR for loss or damage to any of the GOODS unless timely written notice of claim has been given as provided in paragraph (A) of this section and unless such lawsuit or other action is commenced by DEPOSITOR no later than the later to occur of: (i) twelve (12) months after date of delivery of such GOODS by CONTRACTOR or (ii) twelve (12) months after DEPOSITOR is notified by CONTRACTOR or a CUSTOMER that loss or damage to part or all of such GOODS has occurred; provided, however, that the foregoing time limits shall not be applicable to any claim by DEPOSITOR for indemnification hereunder of third party claims arising from such loss or damage.

(C) When GOODS have not been delivered, notice may be given of known loss or damage to the GOODS by email, mailing of a letter via certified mail, or overnight delivery to the DEPOSITOR.

### 19. COVENANTS OF CONFIDENTIALITY AND NON-SOLICITATION EMPLOYEES.

(A) Each Party (a "Recipient") acknowledges that (i) the other Party ("Disclosing Party") is the owner of valuable trade secrets and other confidential or proprietary information, and may license trade secrets or information from others; (ii) in the performance of this Agreement, Recipient may receive or become aware of that information as well as other confidential and proprietary information concerning the Disclosing Party's business, products, services, content, finances, product designs and plans, customer lists, and other marketing and technical information and other unpublished information (collectively, the "Confidential Information"), and (iii) unauthorized disclosure of any Confidential Information of a Disclosing Party may irreparably damage such Disclosing Party.

(B) Confidential Information does not include information that: (i) is in the public domain through no fault of the Recipient; or (ii) is disclosed by the Recipient with the Disclosing Party's prior written approval (but only to the extent that such disclosure by Recipient is in accordance with that approval). The Recipient may disclose the Disclosing Party's Confidential Information to the extent the Recipient is compelled to do so by applicable law, regulation or governmental order, provided that the Recipient employs reasonable efforts to secure confidential treatment of any Confidential Information that is disclosed and provides notice, to the best of its ability, to the Disclosing Party before making any permitted disclosure and provides the Disclosing Party with a reasonable opportunity, to the best of its ability, to seek a protective order from a court to protect the confidentiality of that Confidential Information.

(C) The Recipient will use the Disclosing Party's Confidential Information only as necessary to perform it obligations under this Agreement and, upon termination hereof, will cease all use the Disclosing Party's Confidential Information. Except as directed in writing by the Disclosing Party, as necessary for providing SERVICES contemplated by this Agreement, or as provided in this Section 19, the Recipient shall not at any time during or after the term of this Agreement disclose any Confidential Information of the Disclosing Party to any person or entity, or permit any person or entity to examine or make copies of any reports or documents that come into the Recipient's possession or control that relate to Confidential Information. Upon termination of this Agreement, the Recipient shall turn over to the Disclosing Party all documents, papers, and other materials in the Recipient's possession or control that contain or relate to the Disclosing Party's Confidential Information. The Recipient acquires no intellectual property rights under this Agreement except as expressly set forth in this Agreement and the limited rights necessary to carry out the purposes of this Agreement.

(D) All Customer and supplier lists and Customer and supplier data collected, developed or assembled by CONTRACTOR in connection with the provision of the SERVICES (the "Vendor Data") is solely owned by DEPOSITOR, shall be deemed Confidential Information of DEPOSITOR hereunder, and may not be sold, disclosed, copied, transferred or made available in any form or manner by CONTRACTOR to or for the benefit of any third party, or used by CONTRACTOR for any purpose other than rendering the SERVICES for the sole benefit of DEPOSITOR under this Agreement. CONTRACTOR shall maintain the Vendor Data with the same degree of care that it applies to its own proprietary data. The maintenance of Vendor Data will include backup and storage procedures, similar to the procedures employed by CONTRACTOR for its own data, to ensure that in the event of systems failure or force majeure no data loss will occur. CONTRACTOR shall provide DEPOSITOR access to Vendor Data on a daily basis. All Data will be current and backed up on a daily basis.

(E) The Recipient acknowledges that use of the Disclosing Party's Confidential Information in violation of this Agreement and/or disclosure of any of the Disclosing Party's Confidential Information may give rise to

9

irreparable injury to the Disclosing Party which is inadequately compensable in damages. Accordingly, the Disclosing Party may seek and obtain injunctive relief against the breach or threatened breach of the foregoing undertakings in addition to any other legal remedies that may be available.

(F) Each Party agrees that during the term of this Agreement and for a period of two (2) years thereafter, neither it nor any of its employees, agents, representatives, or affiliates shall, directly or indirectly, (i) solicit the employment of, or influence the employment status of an employee of the other Party (or of any of such Party's affiliates), or (ii) solicit or otherwise seek to do business in Savannah, Georgia (the "Territory") with any Restricted Customer (as hereinafter defined) of the other Party; or attempt to do any of the foregoing without in each case obtaining the other Party's prior written consent. Each Party acknowledges that its solicitation or attempted solicitation of an employee or Restricted Customer of the other Party in violation of this Section 19(F) will give rise to irreparable injury to the non-breaching Party which is inadequately compensable in damages. Accordingly, the non-breaching Party may seek and obtain injunctive relief against the breach or threatened breach of the foregoing non-solicitation covenants in addition to any other legal remedies that may be available.

For purposes hereof, a "Restricted Customer" of a Party shall mean any customer, manufacturer or supplier of such Party who utilizes such Party's 3PL services and/or, in the case of DEPOSITOR, distribution services, at the FACILITIES or in the Territory, provided, however, that the provisions of this Section 19(F) shall not be applicable to any Restricted Customer of a Party who (a) is also an existing active Restricted Customer of the other Party as of the date hereof, but solely to the extent of the services currently being provided by the other Party, or (b) initiates contact with the other Party, or issues a general RFP, for 3PL services in the Territory which are outside the scope of services then currently being provided by such Party; provided further, however, that in the case of clause (b), the Parties shall mutually agree to provide a joint proposal to such Restricted Customer to the extent of such additional 3PL services being sought, and any reward thereof shall be for the joint benefit of the Parties.

20. **NOTICES**. Unless otherwise specified herein such as with respect to instructions under Section 4(F), any notice to either party to this Agreement by the other shall be deemed to have been properly given if (i) sent to said party by nationally recognized overnight courier or (ii) mailed to said party by certified mail return receipt requested, in each case to the address for such party set forth below or to such other address or person as either party may designate by notice to the other party hereunder.

To DEPOSITOR:    Englewood Marketing Group Inc.
1471 Partnership Drive
Green Bay, WI 54304
Attn: Scott Luedke

To CONTRACTOR:    ONL-RBW Logistics, LLC
Attn: Frank Anderson
326 Prep Phillips Drive
Augusta, GA 30901

*A notice hereunder shall be deemed to have been given as of (i) the next business day after being sent by overnight courier or (ii) five (5) days after being mailed by certified mail date it was received.*

21. **DOCUMENTS OF TITLE**. Documents of title, including warehouse receipts, may be issued either in physical or electronic form at the option of the parties.

22. **MODIFICATION**. Any amendment or modification to this Agreement shall be effective only if in writing and signed by each party hereto.

23. **ENTIRE AGREEMENT**. The attached Appendices A, B, C, and D are incorporated into and as a part of this Agreement. This Agreement, together with the applicable CUSTOMER OPERATING PROCEDURES, embodies the entire agreement and understanding between the parties and supersedes all prior agreements and understandings between them relating to the subject matter hereof.

10

24. **GOVERNING STATE LAW**. This Agreement and the legal relationship between the Parties hereto shall be governed by and construed in accordance with the substantive laws of the state where the FACILITIES are located, including Article 7 of the Uniform Commercial Code as ratified in that state, notwithstanding its conflict of laws rules. Any lawsuit or other action involving any dispute, claim, or controversy relating in any way to this Agreement may be brought in the appropriate state or federal court in the state where the FACILITIES are located.

25. **SEVERABILITY AND WAIVER**. (A) If any term of provision of this Agreement or any application thereof shall be invalid or unenforceable, by order, decree, or judgment of a court of competent jurisdiction the remainder of this Agreement or any other application of such term or provision shall not be affected thereby but shall remain in full force and effect.

(B) A Party's failure to require strict compliance with any provision of this Agreement shall not constitute a waiver or estoppel to later demand strict compliance with that or any other provision(s) of this Agreement.

(C) The provisions of this Agreement shall be binding upon the heirs, executors, successors, and assigns of both DEPOSITOR and CONTRACTOR,

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed by their authorized representatives as of the day and year first above written.

**DEPOSITOR:** ENGLEWOOD MARKETING GROUP, INC.  **CONTRACTOR:** ONL-RBW LOGISTICS, LLC

By _____    By _____

PRINT _KEVON J OAK_    PRINT _FRANK ANDERSON_

Title _EMG - CEO_    Title _PARTNER_ _____

Date _8 / 7 / 19_    Date _8/7/19_

**Appendix A (attachment)**

To the Agreement dated August 1, 2019

Rates and Charges:

Facility Location(s):
300 Morgan Lakes Industrial Boulevard, Pooler, GA 31322

Rates:

| | |
|---|---|
| Devanning Containers: | $320/Container |
| Inbound Handling Put Away: | $3.90/Pallet |
| Receipt/Recurring Monthly Storage Charge: | $9.25/Pallet per month |
| (Split month invoicing for receipt storage) | |
| Inbound Handling: | $0.24/Case |
| Domestic shipments only, no devanning | |
| Outbound Handling per Each: | $0.75/Each |
| Small package shipments | |
| Outbound Handling per Case: | $0.58/Case |
| Labeling Charge: | $0.18/Label |
| Consignee Required Labeling, UCC128 | |
| Order Processing Charge – Small Package: | $1.25/Order |
| Order Processing Charge – LTL: | $4.50/Order |

Accessorial Charges:

| | |
|---|---|
| CONTRACTOR/Clerical Labor: | $31.05/Hour |
| CONTRACTOR/Clerical OT Labor: | $38.75/Hour |
| Forklift & Operator Labor: | $52.00/Hour |
| Forklift & Operator OT Labor: | $58.00/Hour |
| Grade B Pallets & Stretch Wrap | $8.50/Pallet |
| Supplies Needed for Daily Operations: | Cost + 15% per Approved Purchase |

Technology Integration Services:

| | |
|---|---|
| EDI X12 940, 945 Setup & Testing: | $2,150 |
| EDIX12 943, 944 Setup & Testing: | $1,900 |
| MIS Management & Support Trading Partner: | $50/Month |
| MIS Additional Trading Partners: | $200/Instance |

Document Fees:

| | |
|---|---|
| 1-250 Documents | Free |
| 251-750 Documents | $0.40/Document |

12

| | |
|---|---|
| UCC 128 Label Testing: | $215/Hour |
| Customized Packing List: | $215/Hour |
| Customized Programming: | $215/Hour |
| Miscellaneous IT Labor: | $215/Hour |

13

Appendix B (attachment)

To the Agreement dated August 1, 2019

Specifications for Services to Be Performed by Contractor:

14

Appendix C (attachment)

To the Agreement dated August 1, 2019

Operating Procedures:

15

Appendix D (attachment)

To the Agreement dated August 1, 2019

Key Performance Indicators:

16

## FIRST AMENDMENT TO AGREEMENT

THIS FIRST AMENDMENT TO AGREEMENT (this "Amendment") is made and entered into as of August 4th 2021 by and between **Englewood Marketing Group, Inc.,** 1471 Partnership Drive, Green Bay, WI 54304, a Delaware corporation ("EMG"), and **ONL-RBW Logistics LLC**, 326 Prep Phillips Dr. Augusta, GA 30901, a Georgia corporation ("ONL-RBW"), All capitalized terms used herein and not otherwise defined shall have the respective meanings ascribed to such terms in the Agreement (as hereinafter defined).

WHEREAS, EMG and ONL-RBW previously entered into that certain Agreement effective August 1, 2019 (the "Agreement"), providing for, among other things, the storage and handling of EMG's Goods at ONL-RBW's warehouse facility located at 300 Morgan Lakes Industrial Blvd, Pooler GA 31322 (the "Original Facility"); and

WHEREAS, EMG and ONL-RBW now desire to amend the Agreement to (i) provide for the transition of the Goods and Services from the Original Facility to the New Facility defined below, (ii) extend the Initial Term and modify the rates specified in Appendix A to the Agreement with respect solely to the New Facility, and (iii) provide for the early termination of the Initial Term solely with respect to Original Facility.

NOW, THEREFORE, for and in consideration of the mutual premises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to modify the Agreement as follows:

1. Effective August 1, 2021 (the "Effective Date"), Appendix A, **Facility Location(s):** is modified to include an additional facility at **239 Jimmy Deloach Parkway, Savannah GA 31408 (the "New Facility").** In furtherance of the foregoing, all references to "FACILITIES" in the Agreement shall be deemed to include each of the Original Facility and New Facility during the remaining respective Initial Terms applicable thereto.

2. Appendix A **Rates:** is modified to provide that the Receipt/Recurring Monthly Storage Charge for the New Facility only shall be in the amount of $0.65 per square foot ("SF") per month commencing on the Effective Date. The minimum monthly rental installments and space requirements for the New Facility only shall be as follows:

| | |
|---|---|
| August 16, 2021 – August 31, 2021 | $35,100.00 for 108,000 SF |
| September 1, 2021 – September 30, 2021 | $105,300.00 for 162,000 SF |
| October 1, 2021 – December 31, 2022 | $140,400.00 per month for 216,000 SF |

**Startup Period:** EMG and ONL-RBW acknowledge that the scope of work necessary for ONL-RBW to provide the Services as contemplated by the transactional pricing set forth in the Agreement dated August 1, 2019 will not be consistent with EMG's long-term requirements as of the Effective Date of this Amendment. During the period from the Effective Date until September 30 2021 (the "Startup Period"), ONL-RBW and EMG will meet on a weekly basis to agree on the level of Services required for the following week. ONL-RBW shall invoice EMG for all mutually agreed Services provided at the hourly rates specified under Schedule A of the Agreement. The quantity and types of equipment required during the Startup Period shall be mutually agreed in advance and billed to EMG at cost (on a pass-through basis). The parties agree that the Startup Period will terminate on September 30, 2021. The end of the Startup Period shall signify the transition from hourly rates to the Transactional Pricing set forth in the Agreement. For the avoidance of doubt, ONL-RBW will not bill EMG pursuant to the Transactional Pricing until the end of the Startup Period.

3. The Initial Term, as specified in Section 1 of the Agreement shall be (i) extended until December 31, 2022, with respect to the New Facility only, and (ii) early terminated with respect to the Original Facility



upon the date on which all of the remaining Goods are removed from the Original Facility. In furtherance of the foregoing, the parties agree that from and after the Effective Date, all inbound GOODS will be stored in the New Facility, and that all GOODS scheduled for shipment shall be picked (1) first from available inventory in the Original Facility until depleted or moved to the New Facility, and (2) then from available inventory in the New Facility.

4.  All SERVICES to be provided at the New Facility will continue to be performed by ONL-RBW employees and personnel, but shall be performed using EMG's applicable technology systems, including its WMS, ERP and reporting tool systems (collectively, the "EMG System"). Any and all training on EMG's System, will be billed to EMG at the hourly rates specified under Schedule A of the Agreement. In connection therewith, EMG will supply to ONL-RBW personnel the necessary hand scanners to pick, count and store the GOODS utilizing the EMG System, as well as any other specialized hardware unique to the operation of the EMG System. Any and all costs associated with installation and programming of access points in the building, to support EMG's System, will billed back at cost to EMG. In addition, EMG shall station one of its employees at the New Facility to oversee and assist with the transition to the new EMG System, for so long as EMG shall deem reasonably necessary. ONL-RBW shall in turn provide EMG with (i) shared access to its LAN equipment that provides POE and to WLAN equipment that is segregated, (ii) an SSID on the WLAN, and (iii) space in its server room to mount two (2) 1U firewall appliances and primary and backup wireless area network circuits to allow for a number of ports to be used for hardwired stations/printers on the floor of the New Facility. EMG shall the right during the last six (6) months of the extended Initial Term for the New Facility, to train and transition the performance of the SERVICES to EMG employees and personnel at the New Facility.

5.  ONL-RBW shall provide the following improvements to the New Facility upon the request of and at a mutually agreed additional cost to EMG, as more fully described on Schedule A hereto: (i) overhead fans, (ii) improved lighting, (iii) electrical drops, (iv) signage, (v) 3 phase 480v electrical for charging, and (vi) such other additional items or services set forth on said schedule (garbage, cleaning, office space, equipment, security, door dock seals). All such improvements will be installed within an agreed upon time frame and cost.

6.  Except as otherwise amended herein, the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this First Amendment to Agreement as of the day and year first written above.

**ENGLEWOOD MARKETING GROUP, INC.**

**By:** _Scot Luedke_                    **Date:** _8-4-2021_
Scott Luedke, its CFO

**ONL-RBW LOGISTICS, LLC**

**By:** _Frank Anderson_                 **Date:** August 4, 2021
Frank Anderson, its Managing Partner

STATE OF WISCONSIN : CIRCUIT COURT : BROWN COUNTY

---

ENGLEWOOD MARKETING GROUP, INC.
1471 Partnership Drive
Green Bay, WI 54304,

              Plaintiff,

    v.

ONL-RBW LOGISTICS, LLC
326 Prep Phillips Drive
Augusta, GA 30901,

              Defendant.

Case No. 2023 CV 88

Code No(s). 30303 (Other Contracts)

---

## ADMISSION OF SERVICE

---

I, James B. Trotter, a licensed attorney of the State of Georgia, hereby acknowledge my authorization to and do accept service of process upon ONL-RBW Logistics, LLC of an authenticated copy of the Summons and Complaint that has been filed in the above-captioned lawsuit. I hereby acknowledge receipt of the Summons and Complaint and admit to service of process of the Summons and Complaint upon ONL-RBW Logistics, LLC, as of the date of execution of this Admission of Service. Any and all defenses are expressly preserved and none are waived.

Dated this 1st day of February, 2023.

TROTTER JONES, LLP

By: _____
     James B. Trotter

*Attorneys for Defendant ONL-RBW Logistics, LLC*

P.O. ADDRESS:
3527 Walton Way Extension
Augusta, GA 30909
Phone:  706-737-3138
Fax:  706-738-3973
jim@trotterjones.com